# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2866

_____

| | | |
|---|---|---|
| Tammy S. Scusa, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Nestle U.S.A. Company, Inc., | * | District of Nebraska |
| doing business as Friskies Petcare | * | |
| Co., Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  January 20, 1999

Filed:  June 23, 1999

_____

Before McMILLIAN, BEAM and LOKEN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.


Tammy S. Scusa appeals from a final order entered in the United States District Court[1] for the District of Nebraska granting summary judgment in favor of appellee, Nestle U.S.A. Co., d/b/a Friskies Petcare Co. (Friskies or the company), and dismissing

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

her claims for sexual harassment and retaliation allegedly committed by her non-supervisory co-workers in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Scusa v. Nestle U.S.A. Co., No. 4:97CV3134 (D. Neb. July 7, 1998) (memorandum and order).

For reversal, appellant argues that the district court erred in granting summary judgment in favor of her employer because there were disputed issues of material fact for a jury to consider on (1) whether she was sexually harassed and (2) whether she was retaliated against for engaging in protected activity. For the reasons discussed below, we affirm the judgment of the district court.

The district court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1343. This court has jurisdiction over this appeal under 28 U.S.C. § 1291. The district court's judgment was entered on July 7, 1998, and the notice of appeal was timely filed on July 10, 1998. Fed. R. App. P. 4(a).

## I. Background

We need not state the facts extensively and, indeed, have little to add to the excellent memorandum opinion of the district court. Appellant has been employed at the Friskies pet food manufacturing plant in Crete, Nebraska, since 1990. At the time of the various incidents at issue, she was a sanitation/pallet washer in the meat preparation department, and, subsequently, at her request she was transferred to the packaging department in September 1996. In the spring of 1996, after a co-worker, Kathy Ramer, had complained about sexual harassment, appellant believed that other employees thought that she was the one who had made the complaint. In July 1996, appellant did file a sexual harassment charge with the state equal opportunity commission. She asserted from that point she was ostracized and isolated by other employees and first-line supervisors. She complained to the human resource manager, Jonathan "Josh" Sprowl, that a co-worker named Larry King had patted her on the

bottom, had blown her kisses and had made sexual comments to her. She also complained that a co-worker and fill-in lead person, Trent Smejdir, had teased her, picked on her, thumped her on the head, and made fun of the way she dressed and ate.

Appellant also complained that on July 3, 1996, co-worker Lonnie Schoenfeld approached her, called her names and yelled at her "You need to get your f------ story straight; I didn't know anything about the f------ minerals. You girls need to leave me the hell alone." Appellant also reported that Schoenfeld made threatening gestures toward her, shaking his fist and cussing at her. Apparently these comments were made during a meeting discussing the sexual harassment complaints and the company sexual harassment policy. According to appellant, there was yelling and crying at the meeting. Plant Manager Bruce Henning slammed his fist on the table out of frustration. Schoenfeld made his "you f------- girls better get your stories straight" comments. In his deposition Schoenfeld testified that he was frustrated by the sexual harassment complaints and the attempts by the company to improve "communication" between the sexes.

Appellant alleged that, after she filed a sexual harassment charge with the state equal opportunity commission, she was subjected to retaliation and continued harassment, for example, some of her co-workers and immediate supervisors stopped talking to her and treated her rudely, followed her around, glared at her, and slammed doors in her face; someone also "keyed" (scratched the finish with a sharp object such as a car key) her car on the plant parking lot. In particular, appellant asserted that co-worker Betty Schoenfeld, Lonnie Schoenfeld's wife, followed her into a bathroom and slammed a door in her face, which upset and frightened her.

Appellant alleged that, because these actions occurred frequently over a long period of time, they created a hostile work environment. She also kept a journal in which she documented these actions at work, for example, recording hostile actions on 25 days between late August and late October 1996. Appellant alleged that

-3-

management was aware of the actions taken against her and did nothing.  For example, she alleged that Lonnie Schoenfeld was never disciplined.  Apparently her complaints were given only "verbal discussions."

Additionally, she asserted that much of the conduct was that of immediate supervisors, such as Smejdir and Mike Blacketer.  She alleged that these individuals were "lead persons" or first-line supervisors, that is, employees who may not have had supervisory titles but who had supervisory authority on the plant floor.

Finally, she asserted that the sexual harassment and retaliation forced her to request a transfer to another job outside of her department.  She also believed that the sexual harassment and retaliation altered her work environment and made it hostile, threatening, stressful, and humiliating.  Appellant in her complaint identified five sexual harassment incidents involving Smejdir[2] and four involving Schoenfeld[3] and

---

[2]Appellant identified five incidents involving Smejdir:

1.  Smejdir teased her and thumped her head.  [Appellant] alleges that Smejdir would "tease [her] and thump [her] head."  Appellant testified that after she told Smejdir not to thump her head, he never did it again. [Appellant] never complained to anyone in management about this behavior.

2.  Smejdir yelled at her for not relieving a co-worker.  [Appellant] testified that in May 1996, Smejdir yelled at her for not relieving a co-worker.  Following this incident, Smejdir was no longer permitted to use [appellant] as a break person.  According to [appellant], Friskies remedied the situation to her satisfaction.

3.  Smejdir told her no extra large t-shirts remained.  In April or May 1996, Smejdir was handing out free t-shirts when employees picked up their paychecks.  When [appellant] asked for an extra large t-shirt, [he] told her there were none.  After [appellant] complained to her supervisor,

-4-

she received an extra large t-shirt.

4.  Smejdir was "snotty and rude" when she refused to help.  In April or May 1996, Smejdir asked [appellant] to help him pick up meat that had dropped on the floor.  [She] told [him] that it was his job, not hers, to pick up the meat.  [Appellant] claims Smejdir got "snotty and rude" with her when she refused to help.  [She] testified in her deposition that she did not think [he] did this because she was a woman.  [Appellant] admitted that she was "snotty and mean" to Smejdir in return.

5.  Smejdir yelled because baskets were stacked wrong.  In June 1996, Smejdir yelled at [appellant] because baskets were stacked on the dock so as to block the control room windows.  [Appellant] told him it was not her responsibility, but she moved the baskets.  [She] did not believe that [he had] yelled at her because she was a woman.  She does not recall complaining to anyone in management about this incident.

Scusa v. Nestle U.S.A. Co., No. 4:97CV3134, slip op. at 3-4 (D. Neb. July 7, 1998) (memorandum and order) (citations omitted).

[3]Appellant identified four incidents involving Lonnie Schoenfeld:

1.  Lonnie told her to use the wrong chemicals.  In May 1996, following Lonnie's instructions, [appellant] added the wrong chemical into the product that was being made.  A co-worker, Mike Blacketer, yelled at her for this mistake.  [Appellant] felt she was being unfairly blamed for Lonnie's mistake.  [She] reported this incident to management and was informed that it would not go on her record.  [Appellant] did not receive a verbal or written reprimand and lost no pay as a result of the incident.  Moreover, following this incident, [appellant] was never placed back at that position.  [Bruce] Henning and Filipi later met with Blacketer and decided to change the chemical labels to avoid future mix-ups.  In [appellant's] opinion, the problem was  appropriately addressed.  [Appellant] admitted that the blame she received had nothing to do with the fact that she was a woman.

many incidents of retaliation by co-workers[4] after she filed her sexual harassment

> 2. <u>Lonnie used profanity and yelled at her.</u>  Lonnie confronted [appellant] after she had laughed with another co-worker about a mistake Lonnie had made  Lonnie came running at her and stopped in front of her. According to [appellant], Lonnie yelled, "You need to get your f------ story straight.  I didn't know anything about the f------ minerals.  You girls need to leave me the hell alone."  As he was walking away, Lonnie yelled, "f------ b----," and [appellant] smiled at him as she walked away. [Appellant] testified, that Lonnie used profanity with both male and female employees and believes that he probably would have reacted the same way had a male employee laughed at his mistake.  After [appellant] reported Lonnie's behavior to her supervisor, Filipi counseled Lonnie that day and told him that such conduct would not be tolerated.  Filipi reported to [appellant] that day that he had verbally disciplined Lonnie for the incident.  After this reprimand, Lonnie never used profanity around her again.
>
> 3.  <u>Lonnie shook his fist 30 feet away from her.</u>  On another occasion, Lonnie was "cussing" as he walked down the stairs and swung his fist out in front of him.  [Appellant] testified that she was more than 30 feet away from Lonnie and that Lonnie may have been talking to himself.  There is no evidence that [appellant] ever told anyone in management about this incident.
>
> 4. <u>Lonnie said "Jesus Christ."</u>  On one occasion Lonnie walked out of the break room and said "Jesus Christ" and walked away.  [Appellant] was the only person in the vicinity at the time.  [She]testified it is possible that Lonnie was talking to himself.

<u>Id.</u> at 5-6 (citations omitted).

[4]Appellant alleged the following incidents of co-worker retaliation:

1.  [Betty Schoenfeld] gave her "hateful, mean looks": [Appellant] claims that after she filed her harassment charges, Betty Schoenfeld began

to give her "hateful, mean looks." [She] reported Betty's conduct to Sprowl. Sprowl advised Betty on at least four occasions to stop if she was in fact giving [appellant] mean looks, although Sprowl could never catch Betty in the act.

2. [Betty Schoenfeld] followed [appellant] into the bathroom: Betty allegedly followed [her] into the bathroom and slammed the door behind her. After [appellant] reported this incident to Sprowl, he investigated, but as there were no witnesses, [he] could not take any disciplinary action against Betty. [Appellant] understood that there was nothing Sprowl could do without witnesses.

3. [Betty Schoenfeld]'s conversation with appellant's uncle: During the summer of 1997, Betty allegedly asked [appellant's] uncle, who also worked at the plant, to tell [appellant] to stop what she was doing because she was causing heartache and problems.

4. Co-workers stopped talking to her: Several individuals stopped talking with her following her reports of alleged harassment. None of these individuals are supervisors. [Appellant] also claims that some or all of these individuals also gave her "dirty looks" following her reports of alleged sexual harassment.

5. [Sonya Gansemer] yelled at [her] for allegedly starting rumor: Non-supervisory employee Sonya Gansemer allegedly retaliated by yelling at [her] and telling her to keep her mouth shut when Gansemer believed that [appellant] had started a rumor that King and Gansemer were sleeping together.

6. [Larry King] told "dirty" joke that [appellant] did not hear: On one occasion, Larry King was telling [Laurie Harris] a joke. [She] did not actually hear the joke, but believed the joke must have been about her because King and Harris looked at [her] and laughed. [She] reported to management that King told a dirty joke, but she acknowledged in her deposition that she had no evidence that King ever told a dirty joke.

charge. After the alleged retaliation but before she filed a retaliation charge, she was moved to another position in the packaging department. In September 1996 appellant filed a retaliation charge. In November 1996 appellant received a position in the internal labor pool. Sprowl approved both transfers and appellant acknowledged that her supervisors have been "very supportive."

Appellant filed this case against Friskies in federal district court in April 1997, alleging claims of sexual harassment and retaliation. The district court granted summary judgment in favor of the company. The district court first found that there were no material facts in dispute. See slip op. at 10. The district court found that appellant failed to establish a sexual harassment claim because she failed to show that she found her co-workers' conduct unwelcome and offensive, see id. at 11-12 (finding appellant used offensive language, teased co-workers and made sexual and off-color comments, which undermined her claim that she found similar conduct by co-workers unwelcome and offensive); she failed to show that harassment was based on sex, see id. at 12-13 (finding appellant failed to show that women in general, and herself in particular, suffered disadvantageous terms or conditions of employment to which men were not exposed; evidence that co-workers were either rude to both women and men or incidents were not based upon her sex); and, finally, she failed to show that the her

-------

7. [Laurie Harris] did not move aside: On one occasion, Harris refused to move aside so [she] could exit a conference room. When [appellant] said, "excuse me please," Harris allegedly gave her an angry look. [Appellant] never complained to any supervisor about Harris's conduct.

8. Car "keyed." [Appellant] claims that her car was "keyed." [She] testified that no one saw who had damaged her car, and therefore, there was nothing Friskies could do to remedy the situation.

Id. at 6-8 (citations omitted).

co-workers' conduct was so severe or pervasive as to alter the conditions of appellant's employment and create an abusive working environment. See id. at 13-15 (finding appellant did not perceive work environment as hostile or abusive subjectively, noting appellant participated in some of the comments which she claimed was offensive and reported only 4 of 9 incidents, each of which was remedied to her satisfaction, or objectively, noting appellant cited isolated incidents of bad language and rude behavior, to which appellant either responded in kind or reported and which the company remedied to her satisfaction).

The district court also found that appellant failed to establish a claim of co-worker retaliation. First, the district court noted that appellant alleged that her co-workers had retaliated against her. See id. at 16 n.2 (noting that appellant did not claim any retaliatory conduct by supervisors, thus implicitly finding that the individuals she characterized as lead persons or first-line supervisors were co-workers, not supervisory employees). The district court then found that appellant failed to show either any adverse employment action or any causal connection between her filing sexual harassment charges and adverse employment action. See id. at 16 (noting appellant testified that she had not suffered any adverse job action and that her supervisors had been supportive and responsive to her complaints). This appeal followed.

## II. Summary Judgment

We review a grant of summary judgment de novo. See Smith v. St. Louis University, 109 F.3d 1261, 1264 (8th Cir. 1997). Summary judgment is appropriate if the movant has shown that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law; in assessing the evidence we take the non-movant's evidence as true, drawing all reasonable inferences in his or her favor. See Fed. R. Civ. P. 56(c); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 268-69 (8th Cir. 1993).

### III. Hostile Work Environment

Appellant first argues that the district court erred in finding that she failed to establish a sexual harassment claim. She argues that she alleged that she was treated in a way that she considered severe, offensive, unwelcome, and threatening, that women were treated differently than men, that the abusive treatment intensified after sexual harassment complaints were made, and that this abusive treatment adversely affected her work environment. In particular, appellant argues that she alleged that her co-workers had physically threatened her, stalked her, humiliated her, cussed at her, glared at her, slammed doors in her face, and ostracized her, and that her car had been vandalized. In addition, appellant argues that there was no evidence that management disciplined anyone for their abusive conduct and that, contrary to the district court's findings, she was not satisfied with management's responses to her sexual harassment complaints. Appellant argues that she repeatedly complained to management and that management only summarily investigated her complaints.

In order to establish a claim of hostile work environment sexual harassment by non-supervisory co-workers, a plaintiff must establish that (a) she belongs to a protected group; (b) that she was subject to unwelcome sexual harassment; (c) that the harassment was based on sex; (d) that the harassment affected a term, condition, or privilege of employment; and (e) that the employer knew or should have known of the harassment and failed to take proper remedial action. See Caviness v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1222 (8th Cir. 1997); Kopp v. Samaritan Health Sys., Inc., 13 F.3d at 269. There is no dispute that appellant is a member of a protected group, but we agree with the district court that she failed to establish the other elements necessary to support a claim of hostile work environment sexual harassment. Consequently, for the reasons discussed below, we hold that the district court did not err in granting summary judgment in favor of Friskies on this claim.

Discrimination Based on Sex

Whether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.  See Montandon v. Farmland Indus., Inc., 116 F.3d 355, 358 (8th Cir. 1997) (Montandon); Quick v. Donaldson Co., 90 F.3d 1372, 1378 (8th Cir. 1996) (Quick) (quoting Harris Forklift Sys., Inc., 510 U.S. 17, 25 (1993) (Harris) (Ginsburg, J., concurring)).  Stated differently, the harassment must be based on the complaining person's sex.  See Montandon, 116 F.3d at 358.  In Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 81 (1998) (Oncale), the Supreme Court said: "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'"

Based on her own admissions, none of the incidents appellant identified as being a basis for her claim of hostile work environment sexual harassment, was, in fact, based on her sex.  Appellant conceded that Smejdir did not yell at her about the spilled meat and basket-stacking incidents because she is a woman.  Nor is there any evidence that Smejdir thumped appellant on the head, yelled at her for not giving another employee a second break, told her no extra large t-shirts remained, was "snotty and rude" to her, or yelled at her because of her sex.  She testified that she believed that Smejdir's attitude and his comments had nothing to do with the fact that she is a woman.

Similarly, none of the incidents involving Lonnie Schoenfeld was based on appellant's sex.  Appellant admitted that Schoenfeld used profanity toward both male and female employees, and she believed that Lonnie would have reacted the same way had a male co-worker laughed at his mistakes.  She admitted that when Schoenfeld slammed the door, looked at her and said, "Jesus Christ," he could have been talking to himself.  Nor is there any evidence that this comment was aimed at her, let alone that

it was made because of her sex. Finally, there is no evidence that establishes that Schoenfeld's mistake about the chemical and his reaction were based on her sex. While it is true that appellant asserted that Schoenfeld treated her differently because she is a woman and because she complained of sexual harassment, she acknowledged in her deposition testimony that Schoenfeld's behavior and comments had nothing to do with her sex, may not have been directed at her, were never reported by her to management, or, if reported, management took adequate remedial action.

Behavior Was Unwelcome

In addition, the conduct at issue must be "unwelcome" in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive. See Meritor Savs. Bank v. Vinson, 477 U.S. 57, 68 (1986) (Meritor); Burns v. McGregor Elec. Indus., Inc., 989 F.2d 959, 962 (8th Cir. 1993); Hall v. Gus Const. Co., 842 F.2d 1010, 1014 (8th Cir. 1988). "The proper inquiry is whether [appellant] indicated by [her] conduct that the alleged harassment was unwelcome." Quick, 90 F.3d at 1378, citing Meritor, 477 U.S. at 68.

We hold that the district court correctly found that appellant was unable to create a genuine issue of material fact on the question of whether the behavior of her co-workers Schoenfeld and Smejdir was unwelcome. The undisputed evidence showed that appellant engaged in behavior similar to that which she claimed was unwelcome and offensive. For example, while appellant complained that Smejdir and Schoenfeld yelled at her, she conceded that she, too, had yelled at other co-workers. Similarly, appellant complained that Schoenfeld called her a "f------ b----," but at the same time she admitted that she called another co-worker a "f------ p----." Appellant also admitted that she had used the "f" word in front of both men and women and used language such as "f------ machine," or this "G.D. machine" while at work, and that she had told off-color jokes at work and teased other employees. On one occasion she admitted that she had an "attitude" when talking to her fellow employees in an unkind way at work

and that she had called Sue Behrens and "chewed her out" when she had a problem with her pay.

Sufficiently Severe or Pervasive

Appellant also had to establish that the alleged harassment was so severe or pervasive as to alter a term, condition, or privilege of employment. See Caviness v. Nucor-Yamato Steel Co., 105 F.3d at 1221. She must show that the workplace is permeated with discriminatory intimidation, ridicule and insult. See Harris, 510 U.S. at 21 (citing Meritor, 477 U.S. at 65).

> The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."

Oncale, 523 U.S. at 81 (citing Harris, 510 U.S. at 21, citing Meritor, 477 U.S. at 67).

The Supreme Court emphasized that this requirement is crucial and that it ensures that courts and juries do not mistake ordinary socializing in the workplace for discriminatory "conditions of employment." Oncale, 523 U.S. at 81. The Supreme Court also said in Faragher v. City of Boca Raton:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992). We have made it

-13-

clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.

118 S. Ct. 2275, 2283-84 (1998) (Faragher) (citations omitted).

The Supreme Court has identified certain factors to consider in determining whether the complained-of conduct is sufficiently severe or pervasive as to constitute sexual harassment under Title VII, and therefore affect the employee's terms and conditions of employment. Specifically, a court should consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "More than a few isolated incidents are required." Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997) (citing Meritor, 477 U.S. at 67). We agree with the district court that appellant failed to prove that the alleged harassment was so intimidating, offensive, or hostile that it "poisoned the work environment." Scott v. Sears, Roebuck & Co., 798 F.2d 210, 214 (7th Cir. 1986); see also Caleshu v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 737 F. Supp. 1070 (E.D. Mo. 1990) (dismissing hostile environment claim even though plaintiff presented evidence that sales manager kissed her, touched her, told her off-color jokes, invited her to dinner). Appellant was able to work full shifts and perform all of her duties. While it is true that she complained about nine incidents, none of them, either individually or collectively, was severe or pervasive enough so as to alter a term, condition, or privilege of her employment.

The issue under Title VII is whether the work environment was both objectively and subjectively offensive, that is, one that a reasonable person would find hostile or abusive. See Harris 510 U.S. at 21-22. "There is no bright line between sexual harassment and merely unpleasant conduct . . . ." Hathaway v. Runyon, 132 F.3d 1214, 1221 (8th Cir. 1997) (citations omitted). "'[S]imple teasing,' offhand comments, and

isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher, 118 S. Ct. at 2283 (citations omitted). Appellant's evidence of a hostile work environment falls flat in light of the fact that she engaged in the very type of conduct about which she now complains, a fact that she does not attempt to refute. See id. (plaintiff must perceive environment as offensive).

Appellant's lawsuit represents an attempt to impose a code of workplace civility under Title VII. This, however, is not the purpose of Title VII. Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace. See e.g., Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir.), cert. denied, 519 U.S. 818 (1996). Moreover, contrary to appellant's argument, the Supreme Court has never held that "workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." Oncale, 523 U.S. at 80. Appellant undoubtedly experienced unpleasant conduct and rude comments, but we hold that the district court was correct in finding that she was not subjected to sexual harassment so severe or pervasive as to alter the conditions of employment and create a hostile work environment in violation of Title VII.

Adequate Remedial Response

There is no dispute that Friskies responded to appellant's complaints to her satisfaction on those occasions when she made Friskies aware of the problems in the workplace. An employer is not liable if it takes prompt remedial action which is reasonably calculated to end the harassment once the employer knew or should have known about the harassment. See Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir. 1999); Zirpel v. Toshiba America Info. Sys., Inc., 111 F.3d 80, 81 (8th Cir. 1997); Callanan v. Runyun, 75 F.3d 1293, 1296 (8th Cir. 1996) (summary judgment was appropriate because the alleged conduct was not frequent, severe, physically

-15-

threatening or humiliating and the defendant took prompt remedial action once it became aware of the improper behavior). Appellant produced no evidence that Friskies knew or should have known of the alleged harassment and yet failed to take proper remedial action. For example, she reported the following incidents: (1) Smejdir yelled at her for not giving another employee a break; (2) Smejdir did not give her an extra large t-shirt; (3) Lonnie Schoenfeld misinformed her about which chemical was to be placed in a product; and (4) Lonnie Schoenfeld confronted her after she laughed at his mistake. After she reported these incidents to management, management took appropriate action: Smejdir was no longer permitted to rely on her for breaks; she received the t-shirt that she wanted; management told her that the chemical mixup incident would not be held against her and she in fact received no warning or reprimand or lost any pay; and Filipi investigated her complaints about Lonnie Schoenfeld and reprimanded him that same day, and thereafter he never used profanity around appellant again. Finally, in September 1996, she was transferred at her request from the meat preparation department. The undisputed evidence showed that every time she complained to management, it responded to her satisfaction. Moreover, after management took action, the incidents were not repeated. Thus, management took appropriate action to end the alleged harassment. Cf. Smith v. St. Louis University, 109 F.3d at 1265 (summary judgment denied where employer took four (4) months to respond to the plaintiff's initial complaints and seven (7) months from the time the plaintiff detailed her complaints). We hold that the district court correctly determined that there was no genuine issue of material fact as to whether Friskies promptly and adequately responded to appellant's complaints.

## IV. Retaliation

Next, appellant argues that the district court erred in finding that she failed to establish a retaliation claim. She argues that it is undisputed that she engaged in protected activity, that is, she complained about sexual harassment and even filed a sexual harassment charge with the state equal opportunity commission. She argues that

her co-workers, as well as co-workers whom she regarded as lead persons or first-line supervisors, treated her with hostility after she engaged in protected activity. She argues that the mere fact that the retaliation was perpetrated by co-workers and not supervisors does not insulate Friskies from liability if Friskies failed to take adequate remedial action. Appellant argues that, although management had a sexual harassment policy and her supervisors were in general supportive, in fact management failed to effectively alleviate the hostile work environment. She argues that, as a result, she was forced to request a transfer to another department, a transfer that she argues was an adverse employment action.

To establish a claim of retaliation, appellant had to show that (1) she filed a charge of harassment or engaged in other protected activity; (2) her employer subsequently took an adverse employment action against her; and (3) the adverse action was causally linked to her protected activity. See Cross v. Cleaver, 142 F.3d 1059, 1071-72 (8th Cir. 1998); Manning v. Metropolitan Life Ins. Co., 127 F.3d 686, 692 (8th Cir. 1997); Cram v. Lamson & Sessions Co., 49 F.3d 466, 474 (8th Cir. 1995). Appellant's retaliation claim is not based on retaliation by supervisory employees. Her retaliation claim is based upon hostility from co-workers which she asserted her supervisors ignored.

No Adverse Employment Action

The undisputed facts show that Friskies did not take any adverse employment action against appellant: (1) she suffered no diminution in her title, salary or benefits; (2) she received her normal raise provided under the collective bargaining agreement; and (3) when she requested, she was transferred, with management approval, from the meat preparation department to packaging. Without proof of the requisite adverse employment action, the district court correctly held that appellant's retaliation claim must fail as a matter of law. See Cross v. Cleaver, 142 F.3d at 1073 (employment actions that are sufficiently adverse to sustain a retaliation claim are also often actions

-17-

in which the retaliator wields the employer's authority, either actually or apparently, to effect the retaliation, which must take the form of a material employment disadvantage); Lyoch v. Anheuser-Busch Cos., 139 F.3d 612, 616 (8th Cir. 1998) (summary judgment was appropriate on plaintiff's retaliation claim because plaintiff suffered no decrease in title, salary, or benefits); Manning v. Metropolitan Life Ins. Co., 127 F.3d at 692 (employment actions that were sufficiently adverse to sustain a retaliation claim include tangible change in duties or working conditions that constituted a material employment disadvantage or an ultimate employment decision such as termination, demotion, reassignment, but not merely hostility, disrespect, or ostracism); Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997) (sufficiently adverse actions include discharge, reduction of duties, actions that disadvantage or interfere with the employee's ability to do his or her job, and "papering" of an employee's file with negative reports and reprimands); Montandon v. Farmland Indus., Inc., 116 F.3d at 359 (sufficiently adverse actions include termination, demotion, transfers involving changes in pay or working conditions, and negative evaluations used as the basis for other employment actions).

Ostracism by Co-workers

Appellant's only claim of retaliation is that her co-workers shunned her. In Manning v. Metropolitan Life Ins. Co., 127 F.3d at 692-93, we held that ostracism and disrespect by supervisors did not rise to the level of an adverse employment action. See also Miller v. Aluminum Co. of America, 679 F. Supp. 495, 505 (W.D. Pa. 1988) (snubbing by supervisors does not amount to unlawful retaliation), aff'd, 856 F.2d 184 (3d Cir. 1988) (table); cf. Ross v. Glickman, 125 F.3d 859 (9th Cir. 1997) (table) (per curiam) (No. 96-16527) (slip op. at 4) (shunning by office staff not actionable hostile work environment under Title VII). These cases suggest that ostracism by co-workers is not an adverse employment action and cannot, without more, be the foundation for a retaliation claim. See Munday v. Waste Management of North America, Inc., 126 F.3d 239, 243 (4th Cir. 1997) (shunning of plaintiff by co-workers at direction of

supervisor does not, as a matter of law, rise to the level of an adverse employment action for Title VII purposes), cert. denied, 118 S. Ct. 1053 (1998); see Wu v. Thomas, 996 F.2d 271, 273 n.3 (11th Cir. 1993) ("we cannot find any case that clearly established that retaliatory harassment, as opposed to sexual or racial harassment, could violate Title VII where the employer caused the employee no tangible harm, such as loss of salary, benefits or position"), cert. denied, 511 U.S. 1033 (1994); Miller v. Aluminum Co. of America, 679 F. Supp. at 505 (plaintiff must show more than occasional unkind words, snubs and perceived slights by defendant's agents to prove adverse employment action); see also Kim v. Nash Finch Co., 123 F.3d at 1060 (court must look for "the kind of serious employment consequences that adversely affected or undermined [the employee's] position, even if she was not discharged demoted or suspended").

We hold that, without evidence of some more tangible change in duties or working conditions that constitute a material employment disadvantage, general allegations of co-worker ostracism are not sufficient to rise to the level of an adverse employment action for purposes of Title VII.

Causal Connection

Finally, to establish a retaliation claim, the plaintiff must show a causal connection between protected activity and an adverse employment action. See Harris v. Secretary of United States Dep't of the Army, 119 F.3d 1313, 1318 (8th Cir. 1997). Here, there is no evidence that appellant's co-workers' behavior, even if it could constitute an adverse employment action, was caused by the employer. Here, appellant testified that Lonnie was rude to her because he was angry and because of appellant's friendship with another employee, Kathy Ramer. She also testified that he yelled at her because she was "just in his way that day and [he] decided to take it out on [her]." None of these explanations establish retaliatory conduct or motive by management, nor do they establish the element of causation that is required in a retaliation case. Thus,

we hold that the district court correctly decided that there was no genuine issue of material fact as to whether there was a causal connection between protected activity and an adverse employment action.

Finally, we note that, in the order granting summary judgment, the district court also struck appellant's affidavit and attachments thereto to the extent that they attempted to create a conflict with her deposition testimony.  See Ode v. Omtvedt, 883 F. Supp. 1308, 1318 (D. Neb. 1995).  The district court also noted, slip op. at 9 n.1, citing Gross v. Burggraff Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995), it was not required to scour the record to locate specific controverting evidence.  Here, appellant failed to assign the court's order as error, nor did she brief the propriety of the order striking her affidavit and attachments thereto.  Hence, appellant cannot now rely on those documents and we deem that she has waived any argument that these documents should be a part of the record on appeal and ought to be considered by this court as demonstrating material facts in dispute.  See Fed. R. App. P. 28(a)(5) (requiring the inclusion of a statement of issues presented for review in appellant's brief); 28(a)(9)(A) ( providing appellant's argument must contain the contentions on the issues presented and the reasons therefor).

## V.  Conclusion

Accordingly, we hold that the district court did not err in granting summary judgment in favor of Friskies on appellant's sexual harassment and retaliation claims; therefore, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-20-